UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------X

LAWRENCE GREEN,                                    **MEMORANDUM AND ORDER**

                                                   14-CV-5489 (KAM)

                    Plaintiff,

     -against-


COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

-------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

          Plaintiff Lawrence Green ("plaintiff") appeals the final
decision of the Commissioner of the Social Security Administration
("defendant" or "Commissioner"), denying plaintiff's application
for Supplemental Security Income ("SSI") under Title XVI of the
Social Security Act ("the Act").  Plaintiff, proceeding *pro se*,
contends that severe medically determinable impairments prevent
him from performing any work and that the Commissioner erred in
denying him SSI benefits.  Presently before the court is the
defendant's motion for judgment on the pleadings.  For the reasons
stated herein, defendant's motion for judgment on the pleadings is
**GRANTED**, and the decision of the Commissioner is **AFFIRMED.**

## I. PLAINTIFF'S PERSONAL AND EMPLOYMENT HISTORY

Plaintiff was born on January 24, 1971, in Brooklyn, New York. (Tr. 52-53.)[1] He is not married, has no children, and lists his mother's residence as his current address. (Tr. 55–56.) Plaintiff completed either the seventh or the eighth grade in special education classes. (Tr. 53, 427.) Plaintiff stopped attending regular school after he was incarcerated as a minor. (Tr. 53.) Plaintiff continued receiving special education during the four-and-half-years he was incarcerated as a juvenile, but he never obtained a high school equivalency diploma through General Educational Development ("GED") testing. (Tr. 53–54.) Plaintiff testified at the Initial Hearing held on December 6, 2012 (hereinafter "Initial Hearing"), that he could not read and did not know how to do math but could count money. (Tr. 54.) Plaintiff reported to his doctors that he could read, however. (Tr. 381, 496, 619.) Further, plaintiff has written several letters and made several motions to this court, and he passed a licensing exam for security work. (Tr. 427; see generally the docket.)

Plaintiff reported that he had the following jobs between 1996 and 2012. (Tr. 282.) From 2004 to 2005, for six months, he worked in the maintenance department for the New York

---

[1] "Tr." citations are to the correspondingly numbered pages in the certified administrative record that is part of the Commissioner's answer.

City Department of Parks and Recreation. (Tr. 59, 282.) His responsibilities included picking up garbage and cleaning bathrooms. (Tr. 59, 262.) In 2007, also for six months, plaintiff worked as a packer and cleaner for FedEx. (Tr. 59, 282.) His responsibilities at FedEx included picking up garbage and packages. (Tr. 281.) From 2007 to 2009, plaintiff worked as a security guard for Elite Investigations and Madison Security Group. (Tr. 60, 242-43, 282.) His responsibilities included patrolling his designated areas and ensuring that there were no irregularities. (Tr. 263.) Plaintiff testified that he left the position after he was shot and robbed on duty. (Tr. 60.) These three roles required an eight-hour work day and five-day work weeks. (Tr. 272.) Plaintiff also testified that he has not been employed since he stopped working as a security guard in 2009. (Tr. 381.) Plaintiff, however, reported to one of his doctors in June 2012, that he was currently working as a security guard, though he denied this at the hearing; plaintiff also reported that he was in the process of getting a permit to carry a firearm. (Tr. 61-62, 529.)

## II.  MEDICAL HISTORY

### A. Evidence Related to Claimed Physical Impairments

*Records from St. John's Episcopal Hospital from September 2009 to March 2011*

On September 10, 2009[2] plaintiff visited Dr. Jayesh Sampat, M.D. with complaints of pain in his right arm and shoulder that radiated to his back. (Tr. 349.) Dr. Sampat noted that plaintiff had normal motor functioning and coordination. (Tr. 350.) The physical examination also revealed that plaintiff's right shoulder was tender and that plaintiff was unable to abduct it; Dr. Sampat diagnosed plaintiff with a shoulder sprain. (*Id.*) On March 4, 2010, plaintiff visited Dr. Saif Khan, M.D. with complaints of itchy skin, skin rash, and earache. (Tr. 355–56.) Dr. Khan diagnosed plaintiff with an ear infection, acute otitis externa, and contact dermatitis while noting that plaintiff had normal motor functioning and coordination. (Tr. 356.)

Dr. Mendel Warshawsky, M.D., examined plaintiff on September 17, 2010. (Tr. 535.) Plaintiff visited the clinic for a pre-employment physical exam; plaintiff had no complaints and reported that he was not in pain. (*Id.*) Dr. Warshawsky observed that plaintiff was "obese, healthy looking" and not in any respiratory distress, and he found no physical abnormalities, other than plaintiff's hypertension and morbid obesity. (Tr. 535.) Plaintiff went in for a follow-up visit on September 20, 2010, and was examined by Drs. Sanda, M.D and Dr. Yan, M.D. (Tr. 537.) Plaintiff indicated that he was not in pain, and Dr. Sanda observed

---

[2] The earliest record pertaining to plaintiff's claimed physical impairments is from September 10, 2009.

that plaintiff was "healthy looking," was not in any respiratory distress and had normal distal pulses, no edema, no organomegaly and no focal deficits; plaintiff's labs were in normal range. (Tr. 537-38.)   Dr. Sanda found that plaintiff had no physical limitations and that plaintiff could engage in recreational programs including sports and swimming. (Tr. 365-66.)   Another follow-up visit on October 20, 2010, with Dr. Susana Bundoc, M.D., returned the same findings.   (Tr. 539-40.) Dr. Bundoc noted that plaintiff had normal motor functioning and coordination, and that plaintiff was counselled to lose weight during the last visit but plaintiff had not made any changes in his diet or exercise regime as instructed by the other doctors.   (*Id.*)

Plaintiff visited St. John's Episcopal hospital on December 9, 2010, March 11, 2011, and March 14, 2011 and saw Drs. Katz, M.D. Wubishet, M.D., and Sandhu M.D.; reports from all three visits showed normal motor functions and coordination.   (Tr. 542-44, 545-46, 548-49.)   Plaintiff had indicated that he had no pain and reported no other complaints during these visits, between September 2010 and March 2011, but was consistently diagnosed with hypertension and morbid obesity.   During these visits, plaintiff was also advised about losing weight to address his obesity.   (Tr. 464-65, 466-67, 535, 542-43, 545-46, 548-49.)

<u>*Records from Industrial Medicine Associates in May 2011*</u>

On May 4, 2011, plaintiff was referred to Robert

Dickerson, D.O., for a consultative examination. (Tr. 380.) Plaintiff reported to Dr. Dickerson that he had "bad legs." However, Dr. Dickerson's examination revealed no abnormality in plaintiff's legs, normal range of motion, no pain on palpation, no sensory motor deficits, he showed no signs of synovitis or inflammation; plaintiff's neurologic examination was normal. (Tr. 380, 383.) Dr. Dickerson's examination revealed that plaintiff exhibited normal gait and stance, walked on heels and toes without difficulty, performed full squats, and used no assistive devices. (Tr. 382.)

Plaintiff complained of a bad back and graded his back pain at a "10/10." (Tr. 380.) Plaintiff reported that the pain was intermittent and associated with prolonged standing and extreme range of motion. Dr. Dickerson found that plaintiff had normal range of motion in his back. (*Id.*) Examination of his spine showed full flexion and extension, and his joints had full range of motion. (Tr. 383.) Dr. Dickerson found that plaintiff had 5/5 strength in his extremities, with no sensory deficit noted. (*Id.*) Plaintiff also reported that he has a "bad heart." (Tr. 380.) The cardiac examination was normal and plaintiff did not report chest pain. Dr. Dickerson noted that plaintiff had high blood pressure and plaintiff stated that he did not take his blood pressure medication on that day. (Tr. 380.) Dr. Dickerson also noted that plaintiff had a history of seizure. (Tr. 381.)

Plaintiff reported that he rode the bus to the examination and that he had the ability to cook, clean, launder, shop, and provide childcare. (Tr. 381.) Plaintiff also said he showered, bathed, and dressed himself five or six times a week and engaged in some recreational activity, including playing sports. (*Id.*) Based on his examination, Dr. Dickerson concluded that plaintiff was "unrestricted for any physical activity." (Tr. 383.)

### Records from St. John's Episcopal Hospital from June 2011 to March 2012

Plaintiff next visited St. John's Episcopal Hospital on June 9, 2011, seeking referrals for pain management and for anxiety. (Tr. 550.) Plaintiff reported that he had been seeing a pain management doctor for years where he was prescribed OxyContin & Gabapentin, and that he wanted to switch doctors because the doctor did not want to dispense pain medications to him anymore because the medications were not found in plaintiff's urine. (*Id.*) Plaintiff reported no acute problems and again was counseled "at length" about monitoring his weight, his blood pressure, and other healthy lifestyle issues. (Tr. 550, 552.) He was discharged with referrals for anxiety disorder treatment and pain management. (Tr. 552.)

On June 13, 2011, plaintiff complained of pain in his lower back, left hip, and knee. (Tr. 553.) Drs. Grohovski, M.D. and Challa, M.D. noted that an x-ray performed on June 9, 2011,

revealed that plaintiff had generalized degenerative disc disease and mild osteo-arthritic changes. (Tr. 553, 598.) Plaintiff was discharged with prescriptions for Ibuprofen and Flexeril and a referral for physical therapy and a follow up with a pain management specialist. (Tr. 554.) Plaintiff visited Drs. Bundoc, M.D., Marie M.D., and Rebolledo, M.D., on August 16, 2011, November 3, 2011 and November 18, 2011, respectively for refills of his medications, a routine examination and to have a form filled out for psychiatry. (Tr. 555, 557, 559.) Plaintiff had no complaints during these visits. (*Id.*) At the November 3, 2011 visit, plaintiff reported that he did not have any pain because his back pain was controlled with Percocet use, and at the November 18, 2011 visit, plaintiff stated he felt well. (Tr. 557, 559.)

Plaintiff complained of pain in his back and left leg, as well as sleep-related problems during his December 16, 2011 visit with Drs. Yan and Grohoviski. (Tr. 561-62.) Plaintiff also reported that he had a mild cough, snored at night, felt fatigued in the day time, and had stomach discomfort. (*Id.*) He was given a refill of his current medications and referrals for his sleep and stomach problems. (Tr. 563.)

On March 9, 2012, Plaintiff visited with Drs. Argishti, M.D. and Bundoc, M.D. for a regular medical check-up, refill of his medications, and a note for his landlord. (Tr. 564-66.) Dr. Argishti noted that plaintiff was referred to the pulmonary clinic

for sleep studies after he complained of snoring issues, but plaintiff refused to have the test done. (Tr. 564.) Dr. Argishti also noted that plaintiff showed no acute distress and no abnormalities were detected. (Tr. 564.) It was suggested to plaintiff that he make a new appointment with the gastrointestinal specialist but plaintiff refused and said that his condition was controlled by his Pepcid medication. (Tr. 564.) All the doctors that examined plaintiff from June 2011 to March 2012 noted plaintiff's history of hypertension and morbid obesity. (Tr. 553, 555, 557, 559, 562, 565.)

*Records from Bushwick Community Health Center from May to August 2012*

Between May 8, 2012 and August 23, 2012, plaintiff was evaluated by various healthcare professionals, including Vivene Salkey, a medical case manager at the Bushwick Community Health Center, and Dr. Loretta Greenidge-Patton, M.D., in order to complete a biopsychosocial report for plaintiff. (Tr. 567-635.) The report indicated that plaintiff can speak, read, and write English. (Tr. 568.) The report also indicated that plaintiff was moderately depressed and that plaintiff was currently being treated for the condition. (Tr. 570.) Plaintiff reported that he watched television, got himself dressed, bathed and used the bathroom by himself. (Tr. 574.) He also reported that he had no hobbies, was not able to wash dishes or his clothes, sweep or mop

the floor, vacuum, make the bed, shop, cook, or socialize. (Tr. 574.)

Plaintiff's medical examination revealed hypertension, pain in the back, left hip and leg, joint pain, dizziness and depression. (Tr. 579.) His physical examination revealed obesity and inability to raise left leg fully. (Tr. 580.) Plaintiff reported that his pain was a 10, on a scale from 1 to 10 with 10 being the worst. (*Id.*) Dr. Greenidge-Patton, M.D. opined that during an 8-hour work period, plaintiff could consistently sit for 1–3 hours, stand for 1–3 hours, walk for 1–3 hours, reach for 1–3 hours, and grasp for 1–3 hours, but could not pull, climb, bend, or kneel. (Tr. 580–81.) Dr. Greenidge-Patton found that plaintiff should be on temporary unemployment for 90 days but found that although that plaintiff was depressed because of his chronic physical condition, his depression was not severe enough in itself to warrant his not returning to work. (Tr. 583.) Dr. Greenidge-Patton found most of plaintiff's chronic conditions were stable but she found his morbid obesity, his glucose condition and his depressive disorder to be unstable. (*Id.*) She recommended adding an anti-depressant to plaintiff's treatment regimen. (Tr. 584–85.)

On May 8, 2012, Dr. Pierre Felix, M.D., examined plaintiff and opined that plaintiff could sit, stand, walk, lift, push, pull, climb and descend stairs, bend at the hip, bend at the

knee, turn his head, bend his neck, and write and grasp normally. (Tr. 609.) Plaintiff refused to perform some of the tests, but to the extent that the plaintiff complied with movement tests, Dr. Felix reported normal findings and noted that there was no evidence of sensory deficits and noted that plaintiff had a normal gait. (Tr. 609, 611–12, 614.) Dr. Felix diagnosed plaintiff with pain in his back, joints, and lower leg, but found that plaintiff's condition was stable. (Tr. 614.)

Georgene Servio, a case manager, conducted a functional capacity assessment on August 23, 2012. (Tr. 586–94, 626–30.) In conducting her assessment she reviewed all the findings from the biopsychosocial assessment, including the psychosocial assessment, lab and other tests, specialty medical exams and any clinical documentation provided. (Tr. 629-630.) Ms. Servio found that plaintiff required a modified work environment where kneeling, pushing, pulling, carrying, stooping, bending, and reaching are limited or eliminated. (Tr. 629.) She also found that plaintiff did not require a travel accommodation. Ms. Servio ultimately concluded that plaintiff was unable to work. (Tr. 629.) She cited plaintiff's morbid obesity, chronic lower back pain, hip and knee pain, hypertension, his depressive disorder, his complaints about his anxiety and issues with sleeping in support of her determination. (Tr. 629-630.)

*Records from Beth Israel Medical Center in June 2012*

Plaintiff made several visits to Beth Israel Medical Center in June 2012. He requested oxycodone at the June 1 and June 14, 2012 visits, but was refused on both occasions because the doctors suspected drug abuse. (Tr. 644-47, 649-51.) Plaintiff was diagnosed with hypertension, morbid obesity, and backache; no abnormalities were revealed from the physical examinations at the June 1st and June 14th visits. (Tr. 644-45, 650-51.) Dr. Masias-Castanon, M.D. during the June 1, 2012 visit, called two pharmacies to verify that plaintiff had prescriptions for oxycodone. (Tr. 650-51.) The first pharmacy reported that plaintiff never had any prescriptions at that pharmacy, and the second pharmacy reported that plaintiff had one prescription for Percocet during November 2011. (*Id.*) Dr. Lau, M.D. also reported on June 1, 2012 that plaintiff's records from the outside facility also demonstrated a possibility of opiate abuse. (Tr. 651.) Plaintiff refused over the counter pain medications after being denied a prescription for oxycodone, he instead requested a pain management referral for oxycodone. (Tr. 651.)

At the June 14, 2012 visit, plaintiff reported that his last oxycodone use was 2 months earlier. (Tr. 644.) He denied using any over the counter medication or any other pain medications during the two months since he ran out of oxycodone. (*Id.*) Plaintiff also reported that he sleeps to overcome the pain and again refused other non-opioid pain medication. (Tr. 644-45.) At

the June 14th visit, Dr. Madrid, M.D. observed that plaintiff was in no apparent pain and easily walked back and forth to the exam room several times, and created a stir in the waiting room as he demanded oxycodone. (Tr. 646-47.) Dr. Madrid further noted that security was called but plaintiff left the clinic without causing other issues. (Tr. 647.)

On June 20, 2012, Dr. Ricardo Cruciani, M.D. examined plaintiff. Dr. Cruciani reported that plaintiff rated his pain as a 5 out of 10 and noted that plaintiff walked "without difficulties but was in clear discomfort when bending over to pick up a piece of paper that he had accidentally dropped." (Tr. 529.) Dr. Cruciani also reported that plaintiff was working as a security guard at the time and was in the process of getting a legal permit to carry a firearm. (*Id.*) Dr. Cruciani's physical examination of plaintiff revealed that plaintiff was in no acute distress but appeared anxious and depressed. (*Id.*) He also noted that plaintiff's range of motion was decreased in all directions and there was tenderness along para-spinal lumbar levels. (Tr. 530.) Dr. Cruciani assessed that plaintiff had lower back pain and recommended an MRI to rule out facet disease. (Tr. 530.) Dr. Cruciani's psychiatric exam revealed that plaintiff's mood was eurythmic, plaintiff had appropriate insight and judgment and plaintiff's short term and long term memory were intact. (*Id.*) On June 27, 2012, Dr. Jan Slomba examined plaintiff. (Tr. 532.)

Her findings were materially consistent with Dr. Cruciani's findings on June 20, 2012. (*Id.*)

<u>*Records from Industrial Medicine Associates in July 2012*</u>

On July 9, 2012, Louis Tranese, D.O., performed a consultative orthopedic examination on plaintiff. (Tr. 502.) Plaintiff reported that he did not cook, clean, do laundry, or shop and that he depended on his parent to shower, to dress and for grooming. (Tr. 503.) Dr. Tranese noted that x-ray reports showed generalized degenerative disk disease in plaintiff's lumbar spine and minimal degenerative arthritis in his left hip and knee. (Tr. 502.) Dr. Tranese found that plaintiff could walk on heels and toes without difficulty but refused to squat, had full flexion and extension in his cervical spine, and had full range of motion in his upper extremities. (Tr. 503-04.) Plaintiff refused to flex or extend his back but was able to bend down to pick up an object from the floor, and had full range of motion in his lower extremities. (Tr. 504.) Plaintiff used no assistive device and needed no help changing for the exam, or getting on and off the exam table, and could rise from the chair without difficulty. (Tr. 503.) Based on his examination and a review of the x-rays that plaintiff provided, Dr. Tranese found that plaintiff may have moderate restriction with heavy lifting and frequent bending, minimal restriction with standing long periods or walking long distances, and mild to moderate restriction with stair climbing,

squatting, or kneeling. (Tr. 505.) He also found that plaintiff had no limitations using his "upper extremities, or fine and gross manual activities" and that plaintiff "ha[d] no other physical functional deficits." (*Id.*)

Dr. Tranese completed the "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form. (Tr. 506-512.) Dr. Tranese concluded that plaintiff could lift and carry up to 20 pounds continuously; plaintiff could frequently lift, and occasionally carry up 50 pounds; plaintiff could occasionally lift, but never carry 51 to 100 pounds. (Tr. 506.) He also found that plaintiff, at one time without interruption, could sit for 8 hours, stand for 6 hours, and walk for 4 hours, and in total for an 8 hour work day, plaintiff could sit for 8 hours, stand for 7 hours and walk for 6 hours. (Tr. 507.) Dr. Tranese found that plaintiff had no limitations with either hand or with use of his right foot but noted that plaintiff had some minor limitations with use of his left foot. (Tr. 508.) Plaintiff was found to frequently be able to climb stairs and ramps, balance, stoop, kneel, crouch and crawl but could only occasionally climb ladders or scaffolds. (Tr. 509.) Plaintiff was not found to have any environmental exposure limitations. (Tr. 510.)

Also on July 9, 2012, Rahel Eyassu, M.D., performed a consultative internal medicine examination on plaintiff. (Tr. 513.) Plaintiff reported that he does not clean, cook, do laundry

or shop, but he reported that he showered and dressed himself. (Tr. 514.) He also reported that he liked to listen to the radio and he liked to read. (*Id.*) Plaintiff used no assistive device and needed no help changing for the exam, or getting on and off the exam table, and could rise from the chair without difficulty. (*Id.*) Plaintiff declined to walk on his heels and toes and he declined to squat. (*Id.*) Dr. Eyassu reported that since plaintiff refused some of the tests, she was only able to find full range of motion in plaintiff's cervical spine, in his upper extremities, in his knees and in his ankles. (Tr. 515.) Dr. Eyassu found that plaintiff experienced pain with forward elevation of the left shoulder. (*Id.*) Dr. Eyassu found no sensory deficits in plaintiff's upper or lower extremities and found that plaintiff had full strength in his upper extremities. (Tr. 516.) She could not determine the strength of his lower extremities because plaintiff refused most of the tests. (*Id.*) Dr. Eyassu's determined that plaintiff would be limited in repetitive bending and activities with heavy lifting, and mildly limited in walking, prolonged standing, prolonged sitting, and excessive neck movements. (*Id.*)

Dr. Eyassu completed the "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form. (Tr. 518-524.) Dr. Eyassu concluded that plaintiff could lift and carry up to 10 pounds frequently; plaintiff could occasionally lift and

carry up to 50 pounds; plaintiff could never lift or carry 51 to 100 pounds. (Tr. 518.) She also found that plaintiff, at one time without interruption, could only sit, stand, and walk for 30 minutes, and in total for an 8 hour work day, plaintiff could sit and stand for 4 hours, and walk for 3 hours. (Tr. 519.) Dr. Eyassu found that plaintiff had some limitation with pushing and pulling, but found no other limitations with either hand. (Tr. 520.) She also found that plaintiff had some minor limitations with using his feet. (Tr. 520.) Dr. Eyassu found that plaintiff could occasionally climb stairs and ramps, kneel, crouch, crawl and climb ladders or scaffolds, and he could frequently balance, operate a motor vehicle and tolerate loud noise; plaintiff could occasionally tolerate unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold, extreme heat, and vibrations. (Tr. 521-22.)

> *Records from Brownsville Community Development Corporation from August to December 2012*

On August 28, 2012, Family Nurse Practitioner, Maggie Farley, F.N.P., of Brownsville Community Development Corporation conducted a physical examination of plaintiff. (Tr. 668-73.) Practitioner Farley noted that plaintiff requested a pain management referral in order to attain a prescription for oxycodone. (Tr. 668.) She also noted that although plaintiff had

not had pain medication for the past month, plaintiff showed no signs of acute distress; he was able to ambulate, sit, stand, change positions and complete his visit comfortably despite reporting that his pain was 10 out of 10. (Tr. 668.) Practitioner Farley reported that plaintiff had a history of hypertension, back pain, anxiety disorder, extreme obesity, and some limitations in his range of motion due to obesity, but otherwise presented no abnormalities. (Tr. 668-70.)

On September 4, 2012, plaintiff saw Practitioner Farley for a "letter for disability" and for the results of the labs conducted at the August 28, 2012 visit. (Tr. 674-680.) Practitioner Farley diagnosed plaintiff with diabetes mellitus type 2, elevated cholesterol, and degenerative disc disease. (Tr. 675.) She noted that plaintiff was newly diagnosed with type 2 diabetes and that there were no associated symptoms. (Tr. 674.) At plaintiff's September 28, 2012 follow up visit, Practitioner Farley noted that plaintiff's compliance with diet was fair but his compliance with exercise was poor. (Tr. 681.) She also noted that plaintiff's diabetes was well controlled. (Tr. 682.) Plaintiff was referred to a podiatrist. (*Id.*)

At a December 17, 2012, plaintiff was seen by the dietician Kelly Weiss. (Tr. 690-91.) Plaintiff reported that he lost 30 pounds over the course of the last two months. (Tr. 690.) He also reported that he did the food shopping and "walked a lot"

as a means of exercise.  (*Id.*)

*Records from Starrett City Podiatry from October to November 2012*

On October 19, 2012, plaintiff visited Starrett City Podiatry seeking diabetic foot care.  (Tr. 660.)  Dr. Vasilios Spyropoulos, D.P.M., assessed that plaintiff had diabetes with neuropathy, hammertoe, posterior calcaneal bone spur, nail fungus and athlete's foot.  (Tr. 661.)  Plaintiff was educated on the risks and possible complications of, and how to prevent complications associated with, his diabetic foot condition.  (*Id.*)  Plaintiff received a prescription for diabetic shoes, lotrisone cream and nystatin powder.  (*Id.*)  On November 2, 2012, Brian Levy, D.P.M., found prolonged distal peak latency and decreased conduction velocity in certain nerves in plaintiff's lower left leg, and decreased conduction velocity in plaintiff's right foot.  (Tr. 653, 708.)  Plaintiff's symptoms were found to be mild to moderate. (*Id.*)

**B. Evidence Related to Claimed Mental Impairments**

*Dr. Christopher Flach, Ph.D.*

On May 4, 2011, Christopher Flach, Ph.D. conducted a consultative "psychiatric evaluation" of plaintiff.  (Tr. 376-79.)  Plaintiff reported that he stopped working as a security guard because it required standing.  (Tr. 376.)  The only medical problems plaintiff reported to Dr. Flach was high blood pressure,

diabetes and a seizure disorder. (*Id.*) Plaintiff reported that he slept "okay" with medication and that he had a mixed appetite. (*Id.*) Plaintiff reported that he was able to dress and bathe himself, do some general cleaning, do laundry, shop, manage money, take public transportation, socialize and date women. (Tr. 378.) He did not report any hobbies. (*Id.*)

Dr. Flach found plaintiff's speech fluent, thought processes coherent with no evidence of any hallucinations, delusion or paranoid thinking, his affect "a little anxious," mood dysthymic, sensorium clear, oriented towards person, place and time, attention and concentration were mildly impaired ("perhaps secondary to academic problems"), recent and remote memory skills were moderately impaired, cognitive functioning was below average, insight and judgment were fair. (Tr. 377–78.) Dr. Flach concluded that plaintiff would be able to follow simple directions and instructions, perform simple tasks independently, maintain a regular schedule, and learn new tasks. (Tr. 378.) He also concluded that plaintiff had mild problems maintaining attention and concentration, dealing with stress, and required some help performing complex tasks. (*Id.*) Dr. Flach ultimately concluded that the results of his examination were consistent with some psychiatric issues, plaintiff's history of substance abuse, and learning difficulties, all of which Dr. Flach found to interfere mildly to moderately with plaintiff's ability to function on a

daily basis. (Tr. 378-79.) Dr. Flach diagnosed plaintiff with bipolar disorder, polysubstance dependence in sustained full remission, and a learning disorder. (Tr. 379.)

### *Dr. Nissan Shliselberg, M.D.*

On June 6, 2011, Nissan Shliselberg M.D., psychiatrist and state consultant, completed the psychiatric review technique form and a mental residual functional capacity assessment. (Tr. 392-408.) In the psychiatric review, Dr. Shliselberg determined that plaintiff had a learning disorder, bipolar disorder, and polysubstance abuse, which was in remission. (Tr. 393, 395, 400.) Dr. Shliselberg also determined that there was no restriction on plaintiff's activities of daily living, no difficulties for plaintiff to maintain social functioning, mild difficulties in maintaining concentration, persistence, and pace, and that plaintiff did not experience repeated extended episodes of deterioration. (Tr. 402.) After considering the totality of the evidence, Dr. Shliselberg concluded in the mental residual functional capacity assessment that plaintiff could remember, understand and carry out simple tasks independently, and complex tasks with some help. (Tr. 408.)

### *Licensed Master Social Work Angel Louis, L.M.S.W.*

On December 7, 2011, Angel Louis, L.M.S.W., completed a biopsychosocial assessment for plaintiff. (Tr. 423-32.) Plaintiff reported that he had no employment goals and indicated

that he did not want a referral for vocational and/or educational services. (Tr. 427.) When asked what his barriers to employment were, plaintiff indicated that he did not want a job. (*Id.*) Plaintiff reported that he experienced the following symptoms for more than a year: depression, hyperactivity, delusions, hallucinations, and paranoia. (Tr. 423.) Plaintiff was diagnosed with bipolar disorder and schizo-affective depression disorder. (*Id.*) Mr. Louis also found plaintiff's psychomotor activity level to be "lethargic/hypoactive," attention and concentration dull, intellectual functioning below average, mood depressed and anxious, insight and judgment poor, and memory fair. (Tr. 430.) He found plaintiff's thoughts to be disorganized and paranoid and that plaintiff also experienced hallucinations. (*Id.*)

### Dr. Carmin Appolon, M.D.

On December 8, 2011, Carmin Appolon, M.D., completed a psychiatric evaluation of plaintiff. (Tr. 418-22.) She found that plaintiff was alert and attentive, had poor concentration, remote memory, and intellectual functioning, was restricted or constricted in affect, had an irritable and expansive mood, had poor insight and impaired judgment, had auditory hallucinations, had rational and coherent thought processes, and had no evident disorder in thoughts and perceptual content. (Tr. 420-21.) Based on her findings, Dr. Appolon diagnosed plaintiff with bipolar disorder. (Tr. 422.)

*Dr. Joseph Voight, M.D.*

Mr. Joseph Voight, M.D. was plaintiff's treating psychiatrist between December 2011 and January 2013. (Tr. 412-417, 766-75.) On January 11, 2012, Dr. Voight noted that plaintiff had denied any psychotic and mood symptoms, his mental condition was stable, and that his speech was articulate and coherent. (Tr. 416.) Plaintiff's 11 follow-up visits between January 2012 and January 2013 resulted in generally similar, if not identical, findings: stable mental condition, articulate speech, full affect, euthymic mood, no hallucination, no delusions, no homicidal or suicidal ideations, fair or good concentration, fair or good memory, fair or good insight, and fair or good judgment. (Tr. 416, 766-75.) On January 18, 2013, Dr. Voight completed a Psychiatric Evaluation Update where he found that plaintiff had good concentration, good memory, good intellectual functioning, euthymic mood, fair insight and awareness, fair judgment, rational and coherent thought process, and no hallucinations or suicidal ideations. (Tr. 764.)

Dr. Voight also completed a Treating Physician's Wellness Plan Report for plaintiff on May 30, 2012. (Tr. 624-25.) He noted that plaintiff was diagnosed with bipolar disorder and substance abuse in remission, and that his relevant clinical findings included (1) articulate speech, normal in rate and volume,

(2) affect in full range, (3) appropriate mood euthymic, (4) thought process was goal-directed, (5) no audio-visual hallucinations, (6) no suicidal or homicidal ideations (7) no delusions, and (8) fair insight and judgment. (Tr. 624.) Dr. Voigt opined that plaintiff was unable to work for at least 12 months. (Tr. 625.) Dr. Voight opined on January 3, 2013 in a report, that plaintiff had poor ability to: sustain attention and concentration for 2 hours at a time, understand, remember, and carry out simple work instructions, conform to normal work rules and schedules, work at a consistent pace until a task is completed, respond appropriately to ordinary work pressures, make judgments on simple work-related problems, perform consistently during the work day without intrusion of mental illness symptom, and respond appropriately to supervisors and coworkers. (Tr. 38, 716-18.)

### Dr. Paul Davis, M.D.

On May 15, 2012, Paul Davis, M.D., a psychiatrist examined plaintiff as a component of the bio-psychosocial evaluation that the Bushwick Community Health Center conducted. (Tr. 616-23.) Dr. Davis indicated that plaintiff was referred because of his chronic back pain and to determine his working ability. (Tr. 617.) Plaintiff reported that he was unable to work, and during the last month he had a depressed mood, lost time, had severe headaches, was forgetful, was fatigued and used drugs. (Id.) Dr. Davis noted that plaintiff was irritable, had a

depressed mood, his form of thought was logical, and his thought content was normal. (Tr. 618.)

Dr. Davis reported that he was unable to assess plaintiff's ability to follow work rules, accept supervision, deal with the public, maintain attention, relate to co—workers, adapt to change and adapt to stressful situations. (Tr. 620.) He diagnosed plaintiff with depressive disorder, and further concluded that plaintiff was unable to work due to plaintiff's back problems and chronic depression. (Tr. 621.) Dr. Davis qualified his conclusion by noting that this determination should be made by plaintiff's treating physicians. (*Id.*) Dr. Davis also noted that plaintiff's "secondary gain of not wanting to work" played a role in plaintiff's presentation, and stated that if plaintiff's only condition was his depression, he would recommend that plaintiff return to work after receiving appropriate psychotropic medication. (Tr. 622.)

### *Dr. Robert Lancer, Psy. D.*

On July 9, 2012, Dr. Robert Lancer, Psy. D., conducted another consultative psychiatric evaluation of plaintiff. (Tr. 494-97.) Plaintiff reported that he was having difficulty sleeping, that he had an increased appetite which led to a 20 pound weight gain, and that he was depressed and anxious. (*Id.*) Plaintiff reported that he can dress, bathe, groom himself, shop and take public transportation. (Tr. 496.) He also stated that

his mother and girlfriend helped him with cooking, cleaning, and laundry because of his psychiatric disorder, and that he spent his days watching TV, listening to the radio and reading. (*Id.*)

Dr. Lancer determined that plaintiff had fluent speech, coherent and goal-directed thought processes with no evidence of hallucinations, delusions, or paranoia, a full range affect which was appropriate in speech and thought content, a neutral mood, mildly impaired attention and concentration resulting from his depression and anxiety, mildly impaired memory skills due to anxiety during the evaluation, average cognitive functioning, poor insight, and fair judgment. (Tr. 495–96.) Dr. Lancer concluded that plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, learn new tasks and perform complex tasks independently. (Tr. 496.) However, Dr. Lancer also concluded that plaintiff had difficulty maintaining attention and concentration, maintaining a regular schedule, making appropriate decisions, relating adequately with others, and appropriately dealing with stress. (*Id.*) He attributed plaintiff's limitations to his current psychiatric disorder. Dr. Lancer diagnosed plaintiff with depressive disorder, anxiety disorder, and substance abuse in sustained remission. (*Id.*)

## III. PROCEDURAL HISTORY

Plaintiff applied for SSI benefits on January 13, 2011, contending that he had been disabled starting from June 12, 2009,

due to a combination of physical and mental impairments. (Tr. 52, 109, 117, 225.) His application was denied by the Social Security Administration ("SSA") on June 6, 2011. (Tr. 109.) On June 10, 2011, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 119.) Two hearings were held before the ALJ, first on December 6, 2012, and then on February 12, 2013. (Tr. 49, 86.) Plaintiff was represented by counsel, and a vocational expert was present at both hearings. (Tr. 49, 86.) On March 28, 2013, the ALJ denied plaintiff's application, finding that plaintiff was not disabled within the meaning of § 1614(a)(3)(A) of the Social Security Act. (Tr. 43.) On May 21, 2013, plaintiff requested a review of the ALJ's decision. (Tr. 25.) On September 3, 2014, the Appeals Council of the Office of Disability Adjudication and Review denied plaintiff's request for review because the Appeals Council found no grounds under the Agency's rules to review the ALJ's decision. (Tr. 1.) Accordingly, the ALJ's denial of plaintiff's claim became final. (*Id.*)

On September 17, 2014, plaintiff filed the Complaint in the present action seeking review of the ALJ's decision denying his claim. (ECF No. 1.) The Commissioner of Social Security filed its answer on December 16, 2014. (ECF No. 10.) On May 15, 2015, the Commissioner moved for judgment on the pleadings. (ECF No. 32.) Plaintiff did not formally oppose the defendant's motion, but he did submit various letters and additional medical records

to the court, between January 2015 and January 2017, requesting among others things, SSI benefits. (*See generally*, the case docket). The court did not consider the additional medical records submitted by plaintiff because they were not before the ALJ when the decision was issued.

<u>**STANDARDS OF REVIEW**</u>

**I.   JUDICIAL REVIEW OF THE SSA'S COMMISSIONER'S DETERMINATIONS**

A district court does not review *de novo* the Commissioner's determination of whether or not a claimant is disabled. *See Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). Rather, a district court "may set aside the [ALJ's] determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks omitted); *see Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). The reviewing court must be certain that the ALJ considered all the evidence when assessing the legal standards and evidentiary support used by the ALJ in his disability finding. 20 C.F.R. § 404.1520(3).

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The reviewing court is authorized to remand the Commissioner's decision to allow the ALJ to further develop the record, make more specific findings, or clarify his rationale. *See Grace v. Astrue*, No. 11-cv-9162, 2013 WL 4010271, at *14 (S.D.N.Y. July 1, 2013); *Butts v. Barnhart*, 388 F.3d 377, 385–86 (2d Cir. 2004) ("Where the administrative record contains gaps, remand to the Commissioner for further development of the evidence is appropriate."); *see also Lopez v. Sec'y of Dept. of Health and Human Services*, 728 F.2d 148, 150–51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him."); *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (indicating that courts may remand the decision when evidence "was not explicitly weighed and considered by [the ALJ], although such consideration was necessary to a just determination of a claimant's application") (internal citations omitted).

## II. LEGAL STANDARDS GOVERNING SSA DISABILITY DETERMINATIONS

"To receive federal disability benefits, an applicant must be 'disabled' within the meaning of the [Social Security] Act." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). A claimant is disabled under the Act when he is unable to engage in any "substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). The SSA has promulgated a "five-step sequential evaluation" to determine whether a claimant is disabled. 20 C.F.R. § 416.920(a)(4).

## A. Determining Disability Through the Five-Step Evaluation

### i. Step One

At step one, the Commissioner determines whether the claimant is currently engaged in substantial gainful employment. 20 C.F.R. § 416.920(a)(4)(i). If the claimant is currently engaged in substantial gainful employment, then the claimant is not disabled "regardless of medical condition." 20 C.F.R. § 416.920(b). Otherwise, the Commissioner moves to step two. 20 C.F.R. § 416.920(a)(4)(ii).

### ii. Step Two

Step two requires the Commissioner to determine whether the claimant has a "severe medically determinable physical or mental impairment" that meets the SSA's duration requirement. 20 C.F.R. § 416.920(a)(4)(ii). An impairment "result[s] from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.908. The burden is on the claimant to provide medical evidence from "acceptable medical

sources" to support his claim that he or she suffers from a disabling impairment. 20 C.F.R. §§ 416.913(a). Subjective symptoms alone are insufficient to establish a physical or mental impairment. 20 C.F.R. § 404.1528(a). When the claimant purports to have a mental impairment, the Commissioner must apply a "special technique" to determine the severity of that mental impairment, evaluating a claimant's pertinent symptoms, signs, and laboratory findings and rating the degree of the claimant's functional limitation. 20 C.F.R. § 416.920a(b)(1)-(2); *Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008).

"The Commissioner is required to consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity to establish eligibility for Social Security benefits." *Burgin v. Astrue*, 348 F. App'x 646, 647 (2d Cir. 2009) (internal quotations omitted). "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.921(a). Such "basic work activities" include: walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out, and remembering simple instructions, using judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a

routine work setting.  20 C.F.R. § 416.921(b).  In assessing severity, the Commissioner will not consider a claimant's age, education, and work experience.  20 C.F.R. § 416.920(c).  If the impairment is medically severe under step two, then the Commissioner will move onto step three.  20 C.F.R. § 416.920(a)(4).

### iii. Step Three

At step three the Commissioner determines whether the claimant's impairments meet or equal one of the "Listing of Impairments" found in 20 C.F.R. Part 404, Sub. P, App'x I.  20 C.F.R. § 416.920(a)(4)(iii).  These are impairments acknowledged by the Secretary to be of sufficient severity to preclude gainful employment.  If a claimant's condition "meets or equals" one of the "listed" impairments, he or she is *per se* disabled and entitled to benefits, irrespective of his or her "age, education, and work experience," and the sequential evaluation ends.  *Id.*; 20 C.F.R. § 416.920(d).

### iv. Step Four

If the claimant's impairments do not "meet or equal" one of the "Listing of Impairments" under step three, then the Commissioner must proceed to the fourth step:  assessing the individual's "residual functional capacity," *i.e.*, his or her capacity to engage in basic work activities, and deciding whether the claimant's residual functional capacity ("RFC") permits the claimant to engage in his or her "past relevant work."  20. C.F.R.

§ 416.920(a)(4)(iv); 20. C.F.R. § 416.920(e).

RFC is defined as the most the claimant can do in a work setting despite the limitations imposed by his or her impairment. 20 C.F.R. § 416.945(a)(1). In determining the claimant's RFC, the Commissioner should consider "all of the relevant medical evidence," as well as descriptions and observations by non-medical sources, such as the claimant's friends and family. 20 C.F.R. § 416.945(a)(3). To the extent that the Commissioner's RFC determination relies on the claimant's allegations of impairment-related symptoms, the Commissioner must evaluate those symptoms using a two-step process. *See* Social Security Ruling 16-3P, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 at *2 (SSA Mar. 16, 2016). First, the Commissioner must determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. *Id.* at *3. Second, the Commissioner must evaluate the intensity and persistence of the claimant's symptoms and determine the extent to which these symptoms limit his or her ability to perform work-related activities. *Id.* at *4.

After making the RFC determination, the Commissioner must determine whether the claimant's RFC is sufficient to perform his "past relevant work," which is defined as substantial gainful activity that the claimant has done within the past fifteen years.

20 C.F.R. §§ 416.920(a)(4)(iv), 416.960(b)(1). If the claimant can perform his past relevant work, he or she is not disabled. 20 C.F.R. § 416.920(f).

### v. Step Five

The fifth and final step is a determination of whether a claimant, in light of his residual functional capacity, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can transition to another job prevalent in the national economy, the claimant is not disabled; on the other hand, if the claimant cannot transition, the Commissioner must find the claimant disabled. 20 C.F.R. § 416.920(g)(1).

The claimant must prove his case at steps one through four; thus, the claimant bears the "general burden of proving . . . disability." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). At the fifth step, the burden shifts from the claimant to the Commissioner requiring the Commissioner to show that in light of the claimant's RFC, age, education, and work experience, he or she is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997); *see also Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). In making that determination, the Commissioner need not provide

additional evidence about the claimant's RFC, but may rely on the same assessment that was applied in step four's determination of whether the claimant can perform his or her past relevant work. *See* 20 C.F.R. § 416.920(g)(1); *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### B. The Treating Physician Rule and Weight Afforded to Other Medical Evidence

"Regardless of its source," the regulations require "every medical opinion" in the administrative record to be evaluated when determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 416.927(c), (d). "Acceptable medical sources" that can provide evidence to establish an impairment include, *inter alia*, claimant's licensed treating physicians and licensed or certified treating psychologists. *See* 20 C.F.R. § 416.913(a). In addition, the SSA may rely on "other sources" to provide evidence of "the severity of [a claimant's] impairment and how it affects [a claimant's] ability to work." 20 C.F.R. § 416.913(d). "Other sources" include, *inter alia*, (1) other medical professionals like physician's assistants, (2) educational personnel, (3) social welfare agency personnel, as well as (4) non-medical sources such as caregivers, parents, and siblings. *Id*. In addition, in certain cases the SSA will pay for a qualified consultative physician to provide a physical or mental examination of a claimant. 20 C.F.R. § 416.917; *see also* 20 C.F.R. §§ 416.919,

416.919g.

Under the regulations, the medical opinion of a treating physician or psychiatrist will be given "controlling" weight if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2); *see also Burgess*, 537 F.3d at 128 (describing the principle as the "treating physician rule") (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [as] an essential diagnostic tool." *Green-Younger*, 335 F.3d at 107. In addition, opinions from "other sources," which are not considered "acceptable medical sources" under the regulations, are "important and should be evaluated on key issues such as impairment severity and functional effects." *Anderson v. Astrue*, No. 07-CV-4969, 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (citing SSR 06-03p, Titles II and XVI: Considering Opinions and Other Evidence From Sources Who are Not "Acceptable Medical Sources" in Disability Claims, 2006 WL 2329939, at *3 (Aug. 9, 2006)).

When a treating physician's opinion is not afforded "controlling" weight, the ALJ must "comprehensively set forth [his or her] reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004);

*see also Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999); 20
C.F.R. § 416.927(c)(2) (stating that the SSA "will always give
'good reasons' in [its] notice of determination or decision for
the weight [given to the claimant's] treating source's opinion").
While the regulations do not explicitly or exhaustively define
what constitutes a "good reason" for the weight given to a treating
physician's opinion, the following factors enumerated in the
regulations may guide an ALJ's determination of what weight to
give a treating source opinion: "(1) the length, frequency, nature,
and extent of the treating relationship, (2) the supportability of
the treating source opinion, (3) the consistency of the opinion
with the rest of the record, (4) the specialization of the treating
physician, and (5) any other relevant factors." *Scott v. Astrue*,
No. 09-CV-3999, 2010 WL 2736879, at *9 (E.D.N.Y. July 9, 2010);
*see also* 20 C.F.R. § 416.927(c)(2)-(6). These same factors may
guide an evaluation of the opinions of "other sources," such as
licensed social workers. *Canales v. Comm'r of Soc. Sec.*, 698
F.Supp.2d 335, 344 (E.D.N.Y. 2010) (citing SSR 06-03p, 2006 WL
2329939, at *2-3; *see also Lopez-Tiru v. Astrue*, No. 09-CV-1638
(ARR), 2011 WL 1748515, at *4 (E.D.N.Y. May 5, 2011) (remanding
case where ALJ failed to give controlling weight to treating
physician's opinion "after making several conclusory statements").

## Analysis

After considering the entire record and applying the

five-step sequential analysis for determining disability outlined above, the ALJ concluded that plaintiff was not disabled under section 1614(a)(3)(A) of the Social Security Act. (Tr. 32, 43.) For the reasons discussed herein, the court finds that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed and defendant's motion for judgment on the pleadings is granted.

## I.   The ALJ's Step One Finding was Proper

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 13, 2011, the application date. (Tr. 32.) The ALJ's finding was supported by the record, as plaintiff's work reports and testimony reflected that plaintiff has not worked since 2009. (Tr. 61, 272.) The court finds that the ALJ's step one finding was supported by substantial evidence.

## II.  The ALJ's Step Two Findings were Proper

At step two, the ALJ found that plaintiff had the following severe impairments: obesity, diabetic neuropathy, hypertension, diabetes mellitus, lumbar degenerative disc disease, and bipolar disorder. (Tr. 32.) The ALJ's finding was supported by the record, as those impairments were reported by plaintiff's treating physicians and confirmed by objective medical evidence during the period since plaintiff's alleged onset date. (*See* Tr. 379, 422–23, 465, 467, 535, 543, 546, 549, 553, 555, 557, 559,

562, 565, 598, 661, 674–75, 681–82.) The ALJ also determined at step two that although plaintiff has a history of polysubstance abuse and possibly a current addiction to oxycodone, this impairment was not severe because there was no indication in the medical records of any functional limitations due to substance abuse, and plaintiff's urine tests were negative for oxycodone. (Tr. 32, 69.) After a review of the entire record, the ALJ also found no evidence of any functional limitations that were caused by substance abuse. (Tr. 32.) Plaintiff reported to several of his doctors that he had not had a substance abuse problem since 1999. (Tr. 381, 385, 477, 503.)

At step two, the ALJ also determined that plaintiff's allegations of chronic pain with radicular symptoms were not severe. (Tr. 32.) The ALJ noted that plaintiff frequently sought pain management but refused to try non-narcotic or over the counter medication and the consultative examiners found 5/5 strength in all extremities, normal neurologic findings and normal range of motion in the shoulders, elbows, forearms, wrists, hips, knees and ankles. (*Id*.) The court finds there is adequate support in the record for the ALJ's finding that plaintiff's complaints of chronic pain were not consistent with the objective medical evidence and other evidence in the record. (*See* Tr. 383, 504, 644–47, 649–51.) Accordingly, the court finds that the ALJ, at step two, correctly applied the proper legal standards, and her findings were supported

by substantial evidence.

### III.    The ALJ's Step Three Findings were Proper

At step three, the ALJ found, after specifically analyzing listings 1.04, 12.04, and 12.06, that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart. P, Appendix 1.  (Tr. 32.)  The court finds that the ALJ correctly applied the proper legal standards, and her Step Three findings were supported by substantial evidence. (Tr. 32-34.)

The ALJ correctly noted that under listing 1.04, plaintiff must establish a spine disorder resulting in compromise of a nerve root with loss of spinal motion, motor loss, and positive straight leg studies.   (Tr. 32-33); 20 C.F.R. § 404, Subpt. P, App'x 1 at § 1.04.  She also noted that the listing may also be met by documented spinal arachnoiditis with attendant symptoms of burning or painful dysthesia, or by spinal stenosis with pseudoclaudication, resulting in ineffective ambulation. (*Id.*)  Under listing 1.04, a finding of degenerative disc disease along with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis would result in a finding of disability.  20 C.F.R. § 404, Subpt. P, App'x 1 at § 1.04. Although the record establishes that plaintiff was diagnosed with degenerative disc disease, the ALJ found that plaintiff failed to

present medical evidence establishing spinal arachnoiditis with attendant symptoms of burning or painful dysthesia, or spinal stenosis with pseudoclaudication, resulting in ineffective ambulation. (Tr. 33.) The ALJ cited x-ray results which revealed only generalized degenerative disc disease with disc space narrowing and marginal osteophyte formation, in support of this findings. (*See* Tr. 33, 598.) The x-rays also showed no compression fractures, normal alignment, intact sacroiliac joints and sacrum, and no paravertebral soft-tissue masses. (*Id.*) Further, x-rays of the lumbosacral spine and left hip showed only generalized degenerative disc disease, mild osteoarthritic changes, and no compression fractures. (Tr. 33, 502, 597-98.) The ALJ also noted that the record contained negative straight leg raises. (Tr. 333, 380-84, 502-24.) Accordingly, the ALJ's finding that none of the medical evidence established symptoms that were severe enough to qualify under Listing 1.04 was supported by substantial evidence.

The ALJ found that plaintiff's mental impairment did not meet or medically equal the criteria listings under 12.04 and 12.06. (Tr. 33.) Under listing 12.04 of the Appendix, a finding of an affective disorder would result in a finding of disability. 20 C.F.R. § 404, Subpt. P, App'x 1 at § 12.04. "The required level of severity for [affective] disorders is met when the requirements in both [Paragraphs] A and B are satisfied, or when the

requirements in [Paragraph] C are satisfied." (*Id.*)

The ALJ found that plaintiff's mental impairments did not result in any of the four conditions required under Paragraph B. (Tr. 33.) To meet the requirements of Paragraph B, plaintiff has to exhibit two of the following four conditions: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpt. P, App'x 1 at § 12.04(B).

The ALJ found that plaintiff's activities of daily living, at most, were mildly restricted. (Tr. 33.) The ALJ correctly noted that plaintiff's own testimonies regarding his daily activities were sometimes, on the same day, vastly different. (Tr. 33; *see e.g.*, Tr. 72-74, 496, 503.) Plaintiff's statements at the ALJ hearing, and elsewhere in the record as noted by the ALJ, indicated that plaintiff could dress, bathe, groom himself, take public transportation, manage money, shop, perform childcare and do laundry. (Tr. 378, 381, 496.) Accordingly, the ALJ's finding that plaintiff's activities of daily living, were, at most, mildly restricted was supported by substantial evidence in the record.

Second, the ALJ found that plaintiff was not markedly restricted in social functioning. (Tr. 33.) The ALJ noted that

Dr. Flach, a consultative examiner, reported that plaintiff had "good social skills," and Dr. Lancer, also a consultative examiner, likewise noted that plaintiff's manner of relating and social skills were "adequate." (Tr. 33, 377, 495.) Further, plaintiff mentioned his fiancé at the December 6, 2012 hearing and elsewhere in the record, and treating psychiatrist, Dr. Voight, reported on multiple occasions that plaintiff had fair or good insight and judgment, and that plaintiff was articulate. (Tr. 74-75, 416-17, 496, 764-75.) Accordingly, the court finds that the ALJ's finding that plaintiff was not markedly restricted in social functioning was supported by substantial evidence in the record.

Third, the ALJ found that at most, plaintiff had moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 33.) The ALJ relied on the two consultative examiners, who found that plaintiff had mildly impaired attention and concentration, and mildly impaired recent and remote memory skills. (Tr. 33, 377-78, 495-96.) These findings were consistent with plaintiff's treating psychiatrist, Dr. Voight, who found that plaintiff had good memory, fair judgment, insight, and awareness, and appropriate thought processes and content. (Tr. 764; *see also* 766-75.) The court finds that the ALJ's finding that plaintiff, at most, had moderate difficulties in maintaining concentration, persistence, or pace was supported by substantial evidence in the record.

Fourth, The ALJ found that plaintiff experienced no episodes of decompensation which have been of extended duration. (Tr. 33.) The ALJ noted that plaintiff has never been psychiatrically hospitalized as an adult. (*Id.*) The record supports the ALJ's finding as plaintiff was psychiatrically hospitalized twice during the 1980s, more than 30 years before the onset of his alleged disability. (Tr. 494.) Accordingly, the ALJ's finding that plaintiff does not meet the requirements of Paragraph B was supported by substantial evidence in the record.

The ALJ determined that the evidence did not establish the presence of Paragraph C criteria for Listings 12.04 and 12.06. (Tr. 34.) To meet the requirements of Paragraph C of 12.04, plaintiff had to show that he has a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an

arrangement.  20 C.F.R. §§ 404, Subpt. P, App'x 1 at § 12.04(C). To meet to requirements of Paragraph C for Listing 12.06, plaintiff had to establish a complete inability to function independently outside the area of one's home.  20 C.F.R. §§ 404, Subpt. P, App'x 1 at 12.06(C).

The ALJ determined that the medical evidence in the record did not indicate that the claimant's mental impairments have resulted in repeated episodes of decompensation, a residual disease process resulting in marginal adjustment, a history of one or more years of inability to function outside of a highly supportive living arrangement, or a complete inability to function independently outside of plaintiff's home. (Tr. 34.)  The ALJ's findings were supported by Dr. Shliselberg who, on June 6, 2011, considered the available medical evidence and concluded Plaintiff's mental impairments did not satisfy the criteria of a "*per se* disabling" impairment set forth in Listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.09 (substance addiction disorders). (Tr. 392.)  Further, the record shows that plaintiff was mentally stable, had not been hospitalized for a psychiatric illness in over 30 years, cared for himself, took public transportation, shopped on occasion, and was able to socialize with family members and his fiancé, in the period after the alleged onset date. (Tr. 74-75, 378, 381, 494, 496, 775.)

Accordingly, the ALJ's finding that plaintiff does not

meet the requirements of Paragraph C was supported by substantial evidence in the record and, thus, the ALJ's conclusion that plaintiff's impairments did not meet or equal a disorder under Listings 12.04 and 12.06 was also supported by the record. *See e.g. Cobb v. Comm'r of Soc. Sec.*, No. 13-cv-0591, 2014 WL 4437566, at *9 (N.D.N.Y. Sept. 9, 2014)(finding that the claimant did not meet the mental listings where "she successfully goes shopping and her manner at all of her counseling sessions was appropriate, despite being outside her home."); *Cruz v. Colvin*, 13-cv-1267, 2014 WL 4384129, at *17 (S.D.N.Y. Aug. 29, 2014)(finding that claimant had not met listing 12.06(c) where "she was able to shop, travel to doctor's appointments, and use public transportation.").

**IV.  The ALJ's Residual Functional Capacity Determination and Step Four Findings were Proper**

Next, the ALJ determined plaintiff's RFC by considering plaintiff's subjective complaints and the medical evidence. (Tr. 34-41.) The ALJ found that plaintiff had the RFC:

> to perform light work as defined in 20 C.F.R. §416.967(b) except the [plaintiff] can stand and walk for 6 hours in an 8-hour workday; can sit for 6 hours in an 8-hour workday; can understand, remember, and carry out simple, routine instructions; and is limited to working in a low stress work environment meaning requiring only occasional decision-making and judgment, only occasional changes in the work setting, procedures, and tools, and only occasional interaction with coworkers and the general public.

(Tr. 34.) The ALJ determined that plaintiff's medically

determinable impairments could reasonably be expected to produce plaintiff's alleged symptoms but found that plaintiff's statements regarding the intensity, persistence and limiting effects of these symptoms were not entirely credible. (Tr. 35) The court finds that the record as a whole did not support plaintiff's subjective complaints and substantial evidence supported the ALJ's findings and decision.

Subjective symptoms such as pain are insufficient to establish that a person is disabled under the Act; there must be medical signs and laboratory findings showing a medical impairment that could reasonably be causing the pain or other symptom. 20 C.F.R. §§ 416.929(a), (b). If plaintiff has a medically determinable impairment that could reasonably cause the symptoms, the Commissioner then evaluates plaintiff's statements about the intensity and persistence of his symptoms and limitations to determine if they suggest a greater restriction of function than is demonstrated by the objective medical evidence. 20 C.F.R. § 416.929(c). The Commissioner considers evidence regarding these factors: plaintiff's daily activities; the nature, location, onset, duration, frequency, and intensity of his pain; factors precipitating or aggravating the pain; the type, dosage, effectiveness, and side effects of medication; any other treatment; and any other measures utilized to relieve the pain or other symptom. *Id.*; SSR 16-3P, 2016 WL 1119029.

Plaintiff alleged at the time he applied for SSI that he suffered mental illness, chronic back pain, hypertension, a heart condition, and chest pain. (Tr. 271.) As discussed above, the record established that plaintiff had obesity, diabetic neuropathy, hypertension, diabetes mellitus, lumbar degenerative disc disease, and bipolar disorder. Accordingly, the court finds that the ALJ's initial finding that plaintiff's alleged impairments were not supported by the objective medical evidence or other evidence and were unlikely to produce the symptoms he complained of, was supported by substantial evidence.

Second, the ALJ evaluated the intensity and persistence of the claimant's symptoms and determined that plaintiff was able to perform light work despite the limiting effects of his symptoms. (Tr. 35-41.) Although a recent Social Security Ruling modified the standard at step two of the RFC inquiry such that it is no longer appropriate for the ALJ to make a "credibility" determination based on the individual's character, an ALJ is still required to examine the entire record and consider whether plaintiff's statements about the intensity, persistence, and limiting effects were consistent with objective medical evidence and other evidence. SSR 16-3P, 2016 WL 1119029, at *1, 4, 7; *compare* to SSR 96-7P, 1996 WL 374186. The court finds that although the ALJ made a credibility determination, (Tr. 40-41), the ALJ correctly applied the controlling legal standard, as

discussed in SSR 16-3P, when she considered the entire record, including the objective medical evidence and resolved the conflicts therein, when making the determination as to the intensity, persistence and limiting effects of an plaintiff's symptoms. SSR 16-3P, 2016 WL 1119029.[3]  Further, the court finds that the ALJ's findings as to the intensity, persistence and limiting effects were supported by substantial evidence in the record.

The ALJ conducted a thorough and detailed review of the record, beginning with plaintiff's physical ailments. (Tr. 35-41.)  The ALJ noted that plaintiff's examinations often showed only normal findings. (Tr. 35.)  She cited a September 2010 examination, where plaintiff complained of shortness of breath, but Dr. Polizzi, the examining physician, reported only normal findings. (Tr. 35, 362.)  The ALJ also cited a December 9, 2010 examination, where plaintiff visited the clinic to obtain prescription refills; again, plaintiff did not report any pain, and upon examination, plaintiff's musculoskeletal findings, neurologic findings, lower extremities findings, and spinal findings were all noted as normal. (Tr. 35, 542-44.)  The ALJ also cited a March 11, 2011, follow up appointment that similarly showed normal findings; plaintiff did not report any back or leg

---

[3] The court notes that prior to the issuance of SSR 16-3P, SSR 96-7P, 1996 WL 374186, was controlling, and that ruling allowed ALJs to assess the credibility of the claimant during the RFC determination.

pain and upon examination, plaintiff's musculoskeletal findings, neurologic findings, lower extremities findings, and spinal findings were all noted as normal. (Tr. 35, 545-47.)

The ALJ also cited plaintiff's examination by Dr. Dickerson on May 4, 2011. (Tr. 35, 380-384.) Plaintiff reported to Dr. Dickerson that he had bad legs, severe back pain, a bad heart and high blood pressure. (Tr. 35, 380-81.) Despite these conditions, plaintiff reported that he rode the bus to the examination and that he had the ability to cook, clean, do laundry, shop, and provide childcare. (Tr. 35, 381.) Plaintiff also reported that he showered, bathed, and dressed himself five or six times a week and engaged in some recreational activity, including playing sports. (*Id.*) The ALJ further noted that upon examination, Dr. Dickerson reported that plaintiff was obese and had high blood pressure but Dr. Dickerson's findings were otherwise normal. (Tr. 35, 383.) The ALJ gave only some weight to the opinion of Dr. Dickerson, a consultative examiner, that plaintiff had no functional limitations due to any physical impairment, because he ALJ determined that plaintiff had some functional limitations because of his morbid obesity and mild to moderate neuropathy. (*Id.*)

The ALJ cited plaintiff's examinations during June 2011, where plaintiff reported no acute problems but indicated that he had chronic back pain. (Tr. 35, 550.) Plaintiff also reported

that he had left hip pain and knee pain during this period. (Tr. 35, 553.) The ALJ further noted that during this period plaintiff reported that he was taking OxyContin and Gabapentin for years to manage his pain, but that he had to switch doctors because his doctor refused to dispense pain medication to him after the medication was not found in his urine. (Tr. 35, 550.) She further noted that x-rays of plaintiff's lumbosacral spine and left hip showed generalized degenerative disc disease and mild osteoarthritic changes, but the ALJ also noted that the x-rays also showed no compression fractures, normal alignment, intact sacroiliac joints and sacrum, and no paravertebral soft tissue masses. (Tr. 35, 553, 598.)

The ALJ noted that on November 3, 2011, plaintiff reported that his back pain was controlled with Percocet, and on November 18, 2011, plaintiff denied feeling any pain. (Tr. 36, 557-560.) She further noted that plaintiff's hypertension was reported as being under control in March 2012. (Tr. 36, 665.)

The ALJ gave some weight Dr. Greenidge-Patton's May 8, 2012, finding that during an 8-hour work period, plaintiff could consistently sit for 1–3 hours, stand for 1–3 hours, walk for 1–3 hours, reach for 1–3 hours, and grasp for 1–3 hours, but could not pull, climb, bend, or kneel. (Tr. 36, 580–81.) The ALJ noted that the limitations that Dr. Greenidge-Patton identified were consistent with plaintiff being able to perform work at the light

exertional level. (Tr. 36.) The ALJ discounted Dr. Greenidge-Patton's opinion that plaintiff could not pull, climb, bend, or kneel because it was not supported by Dr. Greenidge-Patton's examination findings or the medical evidence in general.

The ALJ discussed plaintiff's June 2012 visits to Beth Israel, where plaintiff sought oxycodone. (Tr. 36, 644-51.) At the first visit on June 1, 2012, the plaintiff reported he was taking oxycodone, 80mg/4 times per day; the ALJ noted that the hospital checked, but found no record of any oxycodone prescription. (Tr. 36, 649-51.) The ALJ noted that, at the next visit, on June 14, 2012, plaintiff was referred to pain management but requested oxycodone in the interim. Plaintiff was not prescribed oxycodone and, although recommended by his doctor, plaintiff refused to take over-the-counter pain medication instead. (Tr. 36, 644-47.) The ALJ noted that during a June 20, 2012 examination, Dr. Cruciani found some mild to moderate limitations in plaintiff's lumbar spine, hips and legs, but Dr. Cruciani otherwise reported normal findings. (Tr. 36, 530.) At the same visit, plaintiff reported to Dr. Cruciani that he was working as a security guard and was in the process of getting a legal permit to carry a firearm. (*Id.*)

The ALJ gave great weight to the July 9, 2012 opinion of Dr. Tranese, the orthopedic consultative examiner. (Tr. 36, 502.) The ALJ noted that plaintiff reported that he did not cook, clean,

do laundry, or shop and that he depended on his parent for showering, dressing and grooming.[4] (Tr. 36, 503.) The ALJ noted that Dr. Tranese reported that during the exam that although plaintiff refused to flex or extend his back, he was able to bend down to pick up a sheet of paper from the floor. (Tr. 36, 504.) Based on his examination and a review of the x-rays that plaintiff provided, Dr. Tranese concluded that plaintiff could occasionally lift and carry up to 50 pounds; in total for an 8 hour work day, plaintiff could sit for 8 hours, stand for 7 hours and walk for 6 hours; plaintiff could continuously reach, handle, finger, feel, push, and pull; could occasionally climb ladders; and could frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. (Tr. 36-37, 506-08.) The ALJ gave great weight to Dr. Tranese's opinion because it was supported by Dr. Tranese's treatment notes and by Dr. Eyassu's findings. (Tr. 37.)

Dr. Eyassu, M.D., consultative examiner, also examined plaintiff on July 9, 2012; her findings were also discussed by the ALJ. (Tr. 37, 513-17.) Dr. Eyassu's examination was largely consistent with Dr. Tranese, except that Dr. Eyassu found that plaintiff could occasionally lift/carry up to 50 pounds; could sit and stand for 4 hours, and walk for 3 hours in an 8-hour workday; plaintiff could continuously reach, handle, finger, feel and could

---

[4] The ALJ also noted that plaintiff reported to Dr. Lancer, on the same day, that he could dress, bathe, and groom himself without assistance. (Tr. 36, n. 1.)

frequently push or pull; could frequently balance and could occasionally climb stairs, ramps and scaffolds, stoop; could occasionally kneel, crouch and crawl; could occasionally be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes and pulmonary irritants, extreme cold and heat, and vibrations. (Tr. 37, 518-23.) The ALJ noted that she gave less weight to Dr. Eyassu's opinion because plaintiff refused to participate in many of the tests and showed poor effort in doing some of the other tests that Dr. Eyassu attempted to conduct. (Tr. 37.)

The ALJ noted other areas in the record where plaintiff's alleged symptoms were inconsistent with the evidence in the record. (Tr. 37.) For instance, on August 28, 2012, plaintiff reported to Nurse Practitioner Farley that his pain was a 10 on a 10-point pain scale. The ALJ noted that Practitioner Farley reported, however, that plaintiff could ambulate, change positions, and completed the visit comfortably.[5] (Tr. 37, 668.) The ALJ gave little weight to Practitioner Farley's September 4, 2012, opinion that plaintiff was limited to sitting, standing, walking, reaching, and grasping for 1-3 hours in an 8-hour work day, and her finding that plaintiff could not push, pull, climb, or bend because they were inconsistent with her findings from August 28,

_____

[5] Practitioner Farley also reported that although plaintiff had been without pain medication for a month, plaintiff was not in acute distress during this visit. (Tr. 668.)

2012, and inconsistent with other evidence in the record. (Tr. 37, 533.) Further, the ALJ noted that in September 2012, plaintiff's diabetes was reported as being well controlled; in October 2012, plaintiff was diagnosed with mid-foot degenerative changes bilaterally, degenerative joint disease and posterior heel spurs bilaterally; in November 2012, plaintiff was diagnosed with mild to moderate neuropathy. (Tr. 37.)

Based on her review of the record, the ALJ concluded that plaintiff had limitations due to his obesity and neuropathy, but the objective findings, plaintiff's statements regarding his daily living, and his work activity all suggested greater functioning than alleged by plaintiff. (Tr. 38.) The ALJ discredited some opinions from 2012 because plaintiff reported to Dr. Cruciani that he was working as a security guard in 2012, and was in the process of attaining a license to carry a firearm. (Tr. 36, 529.) Plaintiff maintained at the hearing that he last worked in 2009 and his earning record from the City of New York is consistent with this statement. (Tr. 13, 242.) Based on this information, the ALJ acted within her authority when she discounted some opinions regarding plaintiff's alleged disability. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). Moreover, even if plaintiff was not employed as a security guard in 2012 and the ALJ should not have discounted plaintiff's other

reports, there was substantial evidence in the record supporting the ALJ's findings. Accordingly, the court finds that the ALJ reviewed the record, resolved conflicts in the evidence and afforded the proper weights to the various medical opinions, and as such, the ALJ's findings were supported by substantial evidence.

Similar to plaintiff's alleged physical impairments, the ALJ found that plaintiff alleged mental issues were not fully supported by the medical evidence. (Tr. 38.) The ALJ noted that Dr. Flach, consultative examiner, examined plaintiff on May 4, 2011, when plaintiff reported that he had dysphoric moods, anxiety, talkative speech, psychomotor agitation, excessive involvement in pleasurable activities, elevated/expansive mood, flight of ideas, short-term memory problems, and concentration problems. (R. 38, 377.) The ALJ noted that despite these symptoms, the claimant reported that he was able to dress and bathe himself, clean, do laundry, shop, manage money, take public transportation, and go on dates with women. (R. 38, 378.) The ALJ noted that Dr. Flach's diagnosis was inconsistent with plaintiff's reported symptoms; Dr. Flach found that plaintiff had good social skills, cooperative demeanor, adequate grooming and hygiene, adequate expressive and receptive language skills, coherent and goal-directed thought processes, clear sensorium, and intact orientation. (Tr. 38, 378-79.) Dr. Flach concluded that claimant only had mild difficulties maintaining attention and concentration and dealing with stress.

(*Id.*)  The ALJ afforded great weight to Dr. Flach's opinion.  (Tr. 38.)

The ALJ afforded some weight to Dr. Shliselberg, M.D., State agency psychiatric consultant's opinion from June 6, 2011. (Tr. 38.)  The ALJ noted that Dr. Shliselberg concluded that plaintiff could work but had some moderate limitations in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace, accept instructions and respond appropriately to criticism from supervisors, and understand, remember, and carry out detailed instructions.  (Tr. 38, 406-08.) The ALJ afforded some weight, but less weight than afforded to Dr. Flach's opinion, to Dr. Shliselberg's opinion because Dr. Shliselberg reviewed the medical evidence but did not actually examine plaintiff.  (Tr. 38.)

The ALJ noted that plaintiff reported he was experiencing auditory hallucinations along with anxiety to Dr. Voight, his treating psychiatrist on November 16, 2011.  (Tr. 38, 716-19.)  Dr. Voight opined on January 3, 2013 that plaintiff had poor ability to sustain attention and concentration for 2 hours at a time, understand, remember, and carry out simple work instructions, conform to normal work rules and schedules, work at a consistent pace until a task is complete, respond appropriately to ordinary work pressures, make judgments on simple work-related

problems, and respond appropriately to supervisors and coworkers. (Tr. 38, 716-18.) The ALJ afforded little weight to Dr. Voight's opinion because it was inconsistent with his treatment notes over the course of the previous 12 months, and because plaintiff only mentioned that he experienced hallucinations when he was in his therapy sessions, but never to any of the other doctors plaintiff visited during the same period. (Tr. 39.)

The court finds that although Dr. Voight was plaintiff's treating psychiatrist, the ALJ gave "good reasons" for discounting his January 3, 2013 opinion.[6] *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 628 (S.D.N.Y. 2006) (The "ALJ can give the treating physicians' opinions less than controlling weight only if they are not well supported by medical findings or are inconsistent with other substantial evidence in the record.") Dr. Voight's treatment notes between December 2011 and January 18, 2013, do not support his January 3, 2013 report. Between December 2011 and January 2013, Dr. Voight typically made the following findings about plaintiff: stable mental condition, articulate speech, full affect, euthymic mood, no hallucination, no delusions, no homicidal or suicidal ideations, fair or good concentration, fair or good memory, fair or good insight, and fair or good judgment. (Tr. 416, 767-75.) The ALJ noted that on January 18, 2013, two

---

[6] The ALJ credited Dr. Voight's opinions and findings expressed in his treatment notes between December 2011 and January 18, 2013. (Tr. 39.)

weeks after Dr. Voight's January 3, 2013 report and his latest psychiatric treatment note in the record, Dr. Voight reported that plaintiff had good concentration, good memory, good intellectual functioning, euthymic mood, fair insight and awareness, fair judgment, appropriate thought process, and no hallucinations. (Tr. 39, 764.) Accordingly, the court finds that the ALJ's decision to not accord controlling weight to Dr. Voight's January 3, 2013 opinion was supported by substantial evidence.

The ALJ also relied on the opinion of Dr. Lancer, a consultative examiner, from July 9, 2012. (Tr. 39, 494-500.) Dr. Lancer opined that claimant had moderate limitations in his ability to interact appropriately with the public, supervisors, and coworkers and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 39, 498-99.) The ALJ gave some weight to this opinion, but noted that Dr. Flach's findings, plaintiff's work activity in 2012, and more recent mental health treatment notes, such as Dr. Voight's January 18, 2013 treatment note, all indicated greater functioning than opined by Dr. Lancer. (Tr. 39.)

In sum, the court finds that the ALJ's RFC finding that plaintiff is able to perform work at the light exertional level when limited to unskilled work in a low stress work environment was supported by substantial evidence. (Tr. 41.) Next, the ALJ concluded that plaintiff was unable to perform any past relevant

work.  (*Id.*)  The ALJ's finding was proper and supported by substantial evidence in the record because the demands of plaintiff's past work exceeded his RFC.  (Tr. 38, 41.)

## V.    The ALJ's Step Five Findings were Proper

At step five, the ALJ determined that there were several jobs available in significant numbers in the national economy that plaintiff could perform.  (Tr. 42-43.)  At step five, the Commissioner has the limited burden of showing there is other work that a claimant can perform.  *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); 20 C.F.R. §§ 416.920(e)-(g).  The Commissioner ordinarily discharges that burden by using the applicable rule(s) in the Medical Vocational Guidelines, which take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at five categories of exertional levels.  20 C.F.R. Part 404, Subpt P, App'x 2 (Grid(s)), § 200.00(b); *see* 20 C.F.R. §§ 416.960(c), 416.969; *see also Heckler v. Campbell*, 461 U.S. 458 (1983).  The ALJ did not use the SSA's Grid Rules, however, to direct a finding of "not disabled" because plaintiff had limitations that affected his ability to do the full range of light work.  (Tr. 42-43.)  The ALJ instead properly relied on vocational expert evidence to assist in determining whether a significant number of jobs existed that plaintiff could perform.  (Tr. 42-43); *see* 20 C.F.R. § 416.966(e); *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983) (vocational expert testimony satisfies the

Commissioner's burden of showing the existence of jobs).  The ALJ relied on, and accepted the Vocational Expert's testimony that there were jobs available in significant numbers in the national economy that someone with plaintiff's age, education, work experience, and residual functional capacity was capable of performing.  (Tr. 42-44, 100-102.)  In sum, substantial evidence in the record supported the ALJ's decision that plaintiff was not disabled under the Social Security Act.

## <u>CONCLUSION</u>[7]

For the foregoing reasons, the court holds that the Commissioner's finding that plaintiff was not disabled as defined by the Social Security Act since January 13, 2011, was supported by substantial evidence in the record. Accordingly, the defendant's Motion for Judgment on the Pleadings is **GRANTED**, and the decision of the ALJ is **AFFIRMED**. The Clerk of Court is respectfully directed to enter judgment for the defendant, and close this case. The Clerk of Court is respectfully directed to serve plaintiff with a copy of this Memorandum and Order, and note service on the docket.

**SO ORDERED.**

Dated:     February 13, 2017
           Brooklyn, New York

                                     _____  ____/s/_____
                                     Kiyo A. Matsumoto
                                     United States District Judge

---

[7] In plaintiff's appeal to the Appeals Council, Ruth Axelrod, plaintiff's counsel during the administrative proceeding, raised several arguments.  (Tr. 346.)  The court evaluated the arguments raised by plaintiff's previous counsel and found them to be without merit.